JOHN F. TUFTS AND MARY A. TUFTS, ET AL.,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1386–76, 1429–76, 1432–76, 1434–76—1436–76.     Filed August 23, 1978.

*Ronald M. Mankoff, Charles M. Meadows, Jr., Robert Edwin Davis,* and *Ronald G. Williams,* for the petitioners.
*David L. Jordan,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined the following deficiencies in the petitioners' Federal income taxes:

| Petitioner | TYE | Deficiency |
|---|---|---|
| John F. Tufts and Mary A. Tufts | 12/31/72 | $30,398.75 |
| Clark, Inc. | 7/31/73 | 12,729.68 |
| William T. Steger and Ruth C. Steger | 12/31/72 | 30,405.00 |
| Robert C. Austin, Sr., and Birdie L. Austin | 12/31/72 | 6,683.49 |
| J. C. Pelt and Jewel Pelt | 12/31/72 | 2,707.00 |
| James E. Stephens and Eula F. Stephens | 12/31/72 | 3,360.89 |

---

[1]Cases of the following petitioners are consolidated herewith: Clark, Inc., docket No. 1429–76; William T. Steger and Ruth C. Steger, docket No. 1432–76; Robert C. Austin, Sr., and Birdie L. Austin, docket No. 1434–76; J. C. Pelt and Jewel Pelt, docket No. 1435–76; James E. Stephens and Eula F. Stephens, docket No. 1436–76.

The Commissioner also determined, in the case of John F. Tufts and Mary A. Tufts, an addition to tax under section 6651(a) of the Internal Revenue Code of 1954[2] in the amount of $8,209.25 and an addition to tax under section 6653(a) in the amount of $1,519.24, but the Commissioner has conceded that the petitioners are not liable for such additions. The issues remaining for decision are: (1) Whether the amount realized by the petitioners upon the sale of their partnership interests includes nonrecourse liabilities allegedly in excess of the fair market value of the property owned by the partnership; and (2) whether the petitioners are entitled to an allowance for attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, John F. Tufts and Mary A. Tufts (husband and wife), William T. Steger and Ruth C. Steger (husband and wife), and Robert C. Austin, Sr., and Birdie L. Austin (husband and wife), all resided in Dallas, Tex., at the time they filed their petitions in these cases. The petitioners, J. C. Pelt and Jewel Pelt (husband and wife), and James E. Stephens and Eula F. Stephens (husband and wife), all resided in Duncanville, Tex., at the time they filed their petitions in these cases. The petitioner, Clark, Inc. (Clark), is a Texas corporation whose mailing address was Duncanville, Tex., at the time it filed its petition in this case. Mr. and Mrs. Tufts filed their joint Federal income tax return for 1972 with the District Director of Internal Revenue, Dallas, Tex. Mr. and Mrs. Steger, Mr. and Mrs. Austin, Mr. and Mrs. Pelt, and Mr. and Mrs. Stephens filed joint Federal income tax returns for 1972 with the Internal Revenue Service Center, Austin, Tex. Clark filed its corporate Federal income tax return for the taxable year ending July 31, 1973,[3] with the Internal Revenue Service Center, Austin, Tex.

On August 1, 1970, Mr. Pelt and Clark[4] entered into a general partnership agreement; the newly formed partnership was

---

[2] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years at issue, unless otherwise indicated.

[3] To be consistent with the references to the other partners, we will refer to Clark's fiscal year ending July 31, 1973, as its 1972 taxable year.

[4] Clark was Mr. Pelt's wholly owned corporation.

known as Westwood Townhouses (the partnership). The agreement provided for allocation of partnership profits and losses in the following proportions: Mr. Pelt, 90 percent and Clark, 10 percent. Neither Mr. Pelt nor Clark made any capital contributions to the partnership at the time of its formation.

On August 7, 1970, the partnership entered into a building loan agreement with the Farm & Home Savings Association (F. & H.), under the terms of which F. & H. agreed to loan the partnership $1,851,500 for the construction of a 120-unit apartment complex in Duncanville, Tex.[5] (the complex). The complex was endorsed for mortgage insurance under section 221(d)(4) of the National Housing Act, 12 U.S.C. sec. 1715 $l$(d)(4). Also on August 7, 1970, the partnership executed a note and a deed of trust in favor of F. & H. Under the terms of the note, interest alone (at a rate of 8.5 percent per annum) was payable monthly, commencing September 1, 1970, to and including April 1, 1972. Beginning May 1, 1972, installments of interest and principal in the sum of $13,573.24 were payable monthly until the entire indebtedness was paid. In any event, the balance of principal remaining unpaid, plus accrued interest, was due and payable April 1, 2012. Under the terms of the note and deed of trust, neither the partnership nor its partners assumed any personal liability for the payment of the loan.

On August 21, 1970, the partnership agreement was amended to admit Mr. Tufts, Mr. Steger, Mr. Stephens, and Mr. Austin as additional general partners. Under the terms of the amendment to the agreement, the profits and losses of the partnership were allocated as follows:

| | |
|---|---|
| Mr. Pelt | 25 percent |
| Clark | 10 percent |
| Mr. Tufts | 25 percent |
| Mr. Steger | 25 percent |
| Mr. Stephens | 7.5 percent |
| Mr. Austin | 7.5 percent |

None of the newly admitted partners made any capital contribution to the partnership at the time he was admitted as a

---

[5]On its U. S. Partnership Return of Income (Form 1065) for 1971 and the period Jan. 1 through Aug. 28, 1972, the partnership claimed a total cost basis for the complex of $1,634,411, of which $188,333 was allocated to the land and $1,446,078 to the buildings. The disposition of the remainder of the loan proceeds is unclear.

partner. The new partners were relatives and friends of Mr. Pelt. In addition, Mr. Steger and Mr. Tufts helped the partnership to obtain financing to build the complex. Although Mr. Pelt had been a builder since 1924, he had not built any apartments previously.

Construction of the complex commenced a short time after financing was arranged. The complex was completed on or about August 21, 1971, at a cost within the projected budget.

As a result of the nonrecourse liability of the partnership, each partner's adjusted basis in his partnership interest on August 21, 1970, was as follows:

| Partner | Basis |
| --- | --- |
| Mr. Pelt | $462,875.00 |
| Clark | 185,150.00 |
| Mr. Tufts | 462,875.00 |
| Mr. Steger | 462,875.00 |
| Mr. Stephens | 138,862.50 |
| Mr. Austin | 138,862.50 |
| | 1,851,500.00 |

During the taxable year 1971, the partners made contributions of cash to the partnership in the following amounts:

| Partner | Contribution |
| --- | --- |
| Mr. Pelt | $21,439 |
| Clark | 308 |
| Mr. Tufts | 2,771 |
| Mr. Steger | 2,771 |
| Mr. Stephens | 231 |
| Mr. Austin | 831 |

During the taxable year 1972, Mr. Pelt contributed an additional $15,861.00 to the partnership. None of the other partners made any additional contributions to the partnership.

During the taxable years 1970, 1971, and 1972,[6] the partners claimed the following amounts as ordinary losses resulting from the partnership operation, exclusive of depreciation:

---

[6]Because of the sale of the partners' interests in the partnership on Aug. 28, 1972, the partnership's taxable year closed with respect to all of the partners as of such date. Secs. 706(c)(1) and 708(b)(1)(B); secs. 1.706–1(c)(1) and 1.708–1(b)(1)(iii)(b), Income Tax Regs.

| Partner | 1970 | 1971 | 1972 |
|---|---|---|---|
| Mr. Pelt | $21,946 | $40,409.00 | $20,629.25 |
| Clark | 8,779 | 16,163.40 | 8,251.50 |
| Mr. Tufts | 21,946 | 40,409.00 | 20,629.25 |
| Mr. Steger | 21,946 | 40,409.00 | 20,629.25 |
| Mr. Stephens | 6,584 | 12,122.80 | 6,188.38 |
| Mr. Austin | 6,584 | 12,122.80 | 6,188.38 |

In addition, during the taxable years 1971 and 1972, the partners claimed as their allocable shares of depreciation the following amounts:

| Partner | 1971 First-year depreciation | 1971 depreciation | 1972 depreciation |
|---|---|---|---|
| Mr. Pelt | $96 | $15,334.00 | $11,578.75 |
| Clark | 38 | 6,133.60 | 4,631.50 |
| Mr. Tufts | 96 | 15,334.00 | 11,578.75 |
| Mr. Steger | 96 | 15,334.00 | 11,578.75 |
| Mr. Stephens | 29 | 4,600.20 | 3,473.62 |
| Mr. Austin | 29 | 4,600.20 | 3,473.62 |

As of August 28, 1972, the adjusted basis of each partner in the partnership was as follows:

| Partner | Adjusted basis |
|---|---|
| Mr. Pelt | $390,182.00 |
| Clark | 141,461.00 |
| Mr. Tufts | 355,653.00 |
| Mr. Steger | 355,653.00 |
| Mr. Stephens | 106,095.50 |
| Mr. Austin | 106,695.50 |

During 1971 and 1972, major employers in the Duncanville, Tex., area laid off substantial numbers of employees. In addition, overbuilding of apartments occurred. As a result of such economic conditions, the partnership was unable to rent its apartments at the originally established rents and reduced the rents in an effort to obtain more tenants. Even at the lower rentals, the complex never achieved full occupancy; 90 out of the 120 apartments in the complex represented the highest occupancy ever achieved by the partnership. The income generated by the complex was never sufficient to enable the partnership to make payments on the principal of its mortgage debt. Thus, as of

August 28, 1972, the principal balance due on the mortgage note was $1,851,500.

On August 28, 1972, each partner sold his partnership interest to Fred Bayles, an unrelated third party. On the same date, each partner also conveyed all of his right, title, and interest in property owned by the partnership to Mr. Bayles. Under the terms of the agreement of sale, Mr. Bayles agreed to pay the expenses incurred by the partners as the result of such sale, including attorney's fees and accountant's fees, up to the sum of $250. He paid no other consideration to the partners. He acquired the complex subject to the liability of $1,851,500. However, as of August 28, 1972, the fair market value of the complex did not exceed $1,400,000.

Each partner reported the sale of his partnership interest on his Federal income tax return for the year 1972, and indicated that a loss had been suffered; however, no deduction was claimed for such loss. In his petition, each partner alleged that he had realized a deductible long-term capital loss by reason of the sale of his partnership interest in an amount equal to the full amount of his cash basis, and claimed he was entitled to a refund for overpayment of taxes "in an amount to be determined by the Court."

In his notices of deficiency, the Commissioner determined that each of the partners had realized a gain on the sale of his partnership interest, computed in the table on p.762.

## OPINION

Section 741 provides that the sale or exchange of an interest in a partnership shall, except to the extent section 751 applies, be treated as the sale or exchange of a capital asset.[7] Gain or loss from the sale of a partnership interest is measured by the difference between the amount realized[8] and the adjusted basis of the partnership interest, as determined under section 705.[9]

---

[7]Sec. 741 is applicable even though the sale of the partnership interest results in a termination of the partnership under sec. 708(b), as in the case before us. Sec. 1.741–1(b), Income Tax Regs.

[8]Sec. 1001(b) provides: "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * * "

[9]The original basis of a partnership interest acquired by contribution is the amount of such contribution, plus the parnter's allocable share of partnership liabilities. Secs. 705(a), 722, and 752(a); secs. 1.705–1(a)(4), 1.722–1, and 1.752–1(a) and (e), Income Tax Regs. As the partnership operates, a partner's basis in his partnership interest can increase or decrease. Basis is increased by any further contributions to the partnership and by the partner's distributive share of taxable income of the

SALE OF WESTWOOD TOWNHOUSES

| Partnership basis | Total | J. C. Pelt | Clark | Robert C. Austin | James E. Stephens | John F. Tufts | William T. Steger |
|---|---|---|---|---|---|---|---|
| Increases: | | | | | | | |
| Liabilities assumed | $1,851,500 | $462,875 | $185,150 | $138,862.50 | $138,862.50 | $462,875 | $462,875 |
| Contributed capital: | | | | | | | |
| 1971 | 28,351 | 21,439 | 308 | 831.00 | 231.00 | 2,771 | 2,771 |
| 1972 | 15,861 | 15,861 | --- | --- | --- | --- | --- |
| | 1,895,712 | 500,175 | 185,458 | 139,693.50 | 139,093.50 | 465,646 | 465,646 |
| Decreases: | | | | | | | |
| 1970 ordinary loss | (87,785) | (21,946) | (8,779) | (6,584.00) | (6,584.00) | (21,946) | (21,946) |
| 1971 ordinary loss | (222,972) | (55,743) | (22,297) | (16,723.00) | (16,723.00) | (55,743) | (55,743) |
| 1971 additional first year depreciation | (384) | (96) | (38) | (29.00) | (29.00) | (96) | (96) |
| 1972 ordinary loss | (128,831) | (32,208) | (12,883) | (9,662.00) | (9,662.00) | (32,208) | (32,208) |
| Adjusted basis | 1,455,740 | 390,182 | 141,461 | 106,695.50 | 106,095.50 | 355,653 | 355,653 |
| Sales price: | | | | | | | |
| Liabilities assumed by purchaser | 1,851,500 | 462,875 | 185,150 | 138,862.50 | 138,862.50 | 462,875 | 462,875 |
| Gain on sale | 395,760 | 72,693 | 43,689 | 32,167.00 | 32,767.00 | 107,222 | 107,222 |
| Ordinary gain (sec. 1250) | 47,099 | 11,775 | 4,710 | 3,532.00 | 3,532.00 | 11,775 | 11,775 |
| Capital gain | 348,661 | 60,918 | 38,979 | 28,635.00 | 29,235.00 | 95,447 | 95,447 |

Sec. 1.741–1(a), Income Tax Regs. The issue in the case before us is the extent to which partnership nonrecourse liabilities are includable in the amount realized upon the sale or exchange of a partnership interest.[10]

The petitioners' position is that nonrecourse liabilities are included in the amount realized only to the extent of the fair market value of the partnership property securing the indebtedness. The Commissioner's position is that under the decisions of this Court, the fair market value of the property is immaterial in determining the amount of gain realized by the petitioners upon the sale of their partnership interests. In the alternative, the Commissioner argues that the fair market value of the complex was at least equal to $1,851,500, the amount of the indebtedness. The petitioners presented substantial and persuasive evidence supporting their view that the fair market value of the property on August 28, 1972, did not exceed $1,400,000; whereas, the Commissioner offered no substantial evidence in support of his claim for a higher valuation. Accordingly, we have made a finding in accordance with the petitioners' evidence, and that disposes of the Commissioner's alternative argument.

In support of their position, the petitioners argue first that a proper analysis of the Supreme Court's decision in *Crane v. Commissioner*, 331 U.S. 1 (1947), requires a decision in their favor. In *Crane*, the taxpayer inherited from her husband property subject to a mortgage debt, in an amount equal to the fair market value of the property. Several years later, facing the threat of foreclosure, the taxpayer sold the property subject to the mortgage, receiving net cash proceeds of $2,500. 331 U.S. at 3–4. The Court held that the basis of property subject to a mortgage includes the amount of the mortgage, although the owner of the property has assumed no liability for payment (331 U.S. at 11) and that when such property is sold subject to the mortgage, the amount realized includes the amount of the

---

partnership, and is decreased (but not below zero) by distributions by the partnership and by the partner's distributive share of losses of the partnership. Certain other items, not relevant here, also result in increases or decreases to basis. Sec. 705(a).

[10]The Commissioner does not dispute the propriety of the petitioners' inclusion of the full amount of the nonrecourse liability in the bases of their partnership interests. The petitioners did not raise any question as to whether, assuming the Court finds that the full amount of the nonrecourse liability is includable in the amount realized on the disposition of their partnership interest, the Commissioner properly determined that a portion of such gain was gain to which sec. 1250(a) applies. See sec. 751(c); sec. 1.751–1(c)(4)(ii), Income Tax Regs.; M. Ginsburg, "The Leaky Tax Shelter," 53 Taxes 719, 739–741 (1975).

mortgage debt (331 U.S. at 13). In support of its determination that the amount realized included the amount of the mortgage, the Court stated at pages 15–16:

She was entitled to depreciation deductions for a period of nearly seven years, and she actually took them in almost the allowable amount. The crux of this case, really, is whether the law permits her to exclude allowable deductions from consideration in computing gain. We have already showed that, if it does, the taxpayer can enjoy a double deduction, in effect, on the same loss of assets. The Sixteenth Amendment does not require that result any more than does the Act [Rev. Act of 1938] itself. [Fn. refs. omitted.]

In support of their interpretation of *Crane,* the petitioners point to the Court's note 37 (331 U.S. at 14) and argue that it implies that if the fair market value of the property is less than the liability, the amount realized is limited to the value of the property. Such footnote states:

Obviously, if the value of the property is less than the amount of the mortgage, a mortgagor who is not personally liable cannot realize a benefit equal to the mortgage. Consequently, a different problem might be encountered where a mortgagor abandoned the property or transferred it subject to the mortgage without receiving boot. That is not this case.

The petitioners also contend that when the value of the property is less than the liability, there is no economic benefit to the taxpayer except to the extent of the fair market value of the property. Similar arguments have been advanced by other taxpayers and have been consistently rejected by this Court. *Millar v. Commissioner,* 67 T.C. 656, 660 (1977), affd. on this issue 577 F.2d 212 (3d Cir. 1978); *Woodsam Associates, Inc. v. Commissioner,* 16 T.C. 649, 654–655 (1951), affd. 198 F.2d 357 (2d Cir. 1952); see also *Mendham Corp. v. Commissioner,* 9 T.C. 320, 324 (1947); *Lutz & Schramm Co. v. Commissioner,* 1 T.C. 682, 688–689 (1943).

In *Millar v. Commissioner, supra,* the taxpayers, shareholders in a corporation known as Grant County Coal Corp. (Grant County), borrowed $500,000 from a third party. The shareholders were not personally liable for the debt; rather, the loans were secured solely by the shareholders' Grant County stock. The borrowed funds were contributed to the capital of Grant County by the shareholders. Grant County had filed an election to be treated as an electing small business corporation under subchapter S (sec. 1371 et seq.) of the Internal Revenue Code. It suffered net operating losses which, as a result of its subchapter S

election, were passed through to its shareholders in proportion to their interests in the corporation; the shareholders claimed such losses as deductions on their individual Federal income tax returns. Subsequently, the lender demanded repayment of the loans; when payment was not forthcoming, he foreclosed on the taxpayers' Grant County stock. At the time of the foreclosure, the value of the stock was less than the amount of the nonrecourse loans. 67 T.C. at 657–659. The taxpayers, relying upon note 37 of *Crane*, argued that no gain had been realized. The Court rejected such argument, and held that the taxpayers had a gain to the extent that the amount realized, in that case the amount of the nonrecourse loans, exceeded the adjusted basis of the surrendered stock. The Court found the fact that the value of the stock surrendered was less than the amount of the loans to be immaterial. 67 T.C. at 660. The Court pointed out that under section 1374(c)(2), the losses deductible by the taxpayers were limited to the adjusted basis of their stock in the corporation and stated with respect to the loans:

Except for the contributions to capital obtained in this manner, petitioners would not have been entitled to deduct the losses of the corporation in the first instance. * * *

* * * petitioners were entitled to include as a part of their adjusted basis within the meaning of section 1374(c)(2) the respective contributions to the capital of the corporation made out of "borrowed" funds. To the extent of such contributions, the petitioners received the benefit of deducting the losses sustained by the corporation. [67 T.C. at 659–660.]

The Court of Appeals for the Third Circuit, in affirming our decision, found it to be "totally in keeping with the spirit and reasoning of *Crane*." 577 F.2d at 215. The court held that the principal reason for the *Crane* holding was to prevent the double tax deductions which would otherwise result.[11] 577 F.2d at 215. The court further found that note 37 of the *Crane* opinion was not intended to create an exception to the rule in cases in which the fair market value of the property surrendered or exchanged is less than the amount of the nonrecourse liability to which the property is subject. 577 F.2d at 215. The footnote merely pointed out that the Supreme Court did not have before it a situation in

---

[11]Several commentators agree. E.g., D. Adams, "Exploring the Outer Boundaries of the Crane Doctrine; An Imaginary Supreme Court Opinion," 21 Tax L. Rev. 159, 168–171 (1966); L. Del Cotto, "Basis and Amount Realized Under *Crane:* A Current View of Some Tax Effects in Mortgage Financing," 118 U. Pa. L. Rev. 69, 83–86 (1969); M. Ginsburg, "The Leaky Tax Shelter," 53 Taxes 719, 730–731 (1975).

which the value of the property was less than the liability and that the economic consequences might be different in such a situation. If note 37 were read to provide an exception when the value of the property is less than the liability, the result would be totally inconsistent with the rationale for the holding of the Court, that is, since the total liability has been taken into consideration in determining other tax consequences of the transaction, the total liability must also be included in the amount realized when the property is transferred. 577 F.2d at 215.

In the alternative, the petitioners argue that since they sold interests in a partnership, section 752(c) compels a decision in their favor. In its entirety, section 752 provides:

(a) INCREASE IN PARTNER'S LIABILITIES.—Any increase in a partner's share of the liabilities of a partnership, or any increase in a partner's individual liabilities by reason of the assumption by such partner of partnership liabilities, shall be considered as a contribution of money by such partner to the partnership.

(b) DECREASE IN PARTNER'S LIABILITIES.—Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual laibilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

(c) LIABILITY TO WHICH PROPERTY IS SUBJECT.—For purposes of this section, a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property.

(d) SALE OR EXCHANGE OF AN INTEREST.—In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.

The petitioners focus upon the language, "For purposes of this section," in subsection (c) and aruge that the fair market value limitation of subsection (c) is applicable to a sale of a partnership interest under subsection (d). Thus, they contend, the amount realized upon the sale of a partnership interest includes a partnership nonrecourse liability only to the extent of the fair market value of the partnership property which is subject to the liability.

The Commissioner contends that the provisions of subsection (c), including the fair market value limitation, were intended to be applied only in connection with the rules of subsections (a) and (b), relating to contributions to and distributions from the partnership or amounts treated as such contributions or

distributions. He asserts that subsection (d) operates independently of subsection (c). After a careful consideration of the parties' arguments, we agree with the Commissioner.

Section 752, enacted as part of the Internal Revenue Code of 1954, generally has been regarded as a codification of the *Crane* doctrine for the purpose of determining the basis of a partner's interest in a partnership. A. Perry, "Limited Partnerships and Tax Shelters: The *Crane* Rule Goes Public," 27 Tax L. Rev. 525, 542 (1972). Subsection (a) provides generally that any increase in a partner's share of the liabilities of the partnership will be treated as a contribution of money by the partner to the partnership, thus increasing (under secs. 705 and 722) his basis for his partnership interest. Under subsection (b), any decrease in a partner's share of the liabilities of the partnership is treated as a distribution of money by the partnership to the partner. Such a distribution reduces the partner's basis for his partnership interest, and if the distribution exceeds the adjusted basis, the excess will be recognized as gain. Secs. 705, 731, and 733. Subsection (c) adopts the *Crane* rule as to nonrecourse liabilities, providing that a liability to which property is subject shall, to the extent of the fair market value of the property, be treated as a liability of the owner of the property, and there may be reason for applying the fair market value limitation in determining the basis of a partner in the partnership (see 1 W. McKee, W. Nelson, and R. Whitmire, Federal Taxation of Partnerships and Partners, par. 7.04, pp. 7–14—7–15 (1977)).

The legislative history of section 752 suggests that the fair market value limitation of subsection (c) was intended to have narrow applicability. The committee reports state with respect to section 752:

Frequently, a partner will assume partnership liabilities or a partnership will assume a partner's liabilities. In some cases this occurs as the result of a contribution of emcumbered property by the partner to the partnership or as the result of a distribution of such property by the partnership to the partner. The provisions of this section prescribe the treatment for such transferred liabilities. * * *

\* \* \* \* \* \* \*

The transfer of property subject to a liability by a partner to a partnership, or by the partnership to a partner, shall, to the extent of the fair market value of such property, be considered a transfer of the amount of the liability along with the property. [H. Rept. 1337, to accompany H.R. 8300 (Pub. L. 591), 83d

Cong., 2d Sess. A236 (1954); S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 405 (1954).]

These statements reveal that in setting forth the fair market value limitation, Congress had in mind only two situations in which it would be applicable: upon the contribution of encumbered property by a partner to the partnership, and upon the distribution of encumbered property by the partnership to a partner.

In contrast, the committee reports state with respect to the sale or exchange of a partnership interest: "When a partnership interest is sold or exchanged, *the general rule for the treatment of the sale or exchange of property subject to liabilities will be applied.*" H. Rept. 1337, *supra* at A236–A237 (emphasis supplied); S. Rept. 1622, *supra.* The fair market value limitation is not mentioned.

The regulations also support the view that subsection (c) has a limited effect. Section 1.752–1 (c), Income Tax Regs. provides:

(c) *Liability to which property is subject.* Where property subject to a liability is contributed by a partner to a partnership, or distributed by a partnership to a partner, the amount of the liability, to an extent not exceeding the fair market value of the property at the time of the contribution or distribution, shall be considered as a liability assumed by the transferee. * * *

The regulations, issued contemporaneously with the enactment of the statute, are entitled to great weight. *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496 (1948); *Fawcus Machine Co. v. United States,* 282 U.S. 375 (1931).

Though the language of section 752(c) is broad enough to support the petitioners' interpretation, the result of adopting such interpretation would be inconsistent with the language of section 752(d) and the rationale for the holding of *Crane.* Subsection (d) expressly provides that "In the case of a sale or exchange of an interest in a partnership, liabilities shall be treated *in the same manner as liabilities in connection with the sale or exchange of property not associated with partnerships.*" (Emphasis supplied.) The general law is well settled that when there is a sale or exchange of property subject to a liability, the amount realized includes the full amount of the liabilities, even though the liability exceeds the value of the property. *Millar v. Commissioner, supra; Woodsam Associates, Inc. v. Commissioner, supra;* see also *Mendham Corp. v. Commissioner, supra; Lutz & Schramm Co. v. Commissioner, supra.* Moreover, under the

petitioners' reading of the statute, they are permitted to include in the bases of their partnership interests the full amount of nonrecourse liabilities, with the result that they are entitled to deduct the partnership losses. However, if they were permitted to exclude a portion of such liabilities from the amount realized on the disposition of their partnership interests, they could avoid accounting for such deductions upon the disposition of their partnership interest, a result *Crane* sought to prohibit.

The statute of course represents the most authoritative expression of congressional purpose, and neither the legislative history nor the regulations may be used in derogation of an unambiguous statutory expression of legislative purpose. However, the interplay of subsections (c) and (d) is not so clearly delineated on the face of the statute as to preclude reliance upon the legislative history and the regulations to ascertain and carry out the legislative purpose. See *United States v. Gilmore*, 372 U.S. 39, 44–45 (1963); *Doing v. Commissioner*, 58 T.C. 115, 129 (1972); *Southern California Loan Assn. v. Commissioner*, 4 B.T.A. 223, 233–234 (1926). If we accept the petitioners' interpretation of the statute, Congress has, in codifying the *Crane* doctrine, legislated the very result *Crane* sought to prohibit. A more reasonable interpretation of subsection (c) is that suggested by the legislative history and the regulations. We conclude that Congress intended the fair market value limitation of subsection (c) to apply only with respect to the contribution or distribution of encumbered property, or with respect to amounts treated as such contributions or distributions, and that subsection (d) was intended to operate independently of the fair market value limitation of subsection (c).[12]

The situation in the case before us is similar to that in *Millar v. Commissioner, supra*. The nonrecourse liability was included

---

[12]Several commentators also have suggested this result. Moreover, the commentators point out that if we accept the broad interpretation of sec. 752(c) urged by the petitioners, other problems of interpretation arise. For example, if the fair market value of property subject to an encumbrance declines so that it is less than the amount of the encumbrance, will the excess of the encumbrance over the fair market value be considered a decrease in the partners' shares of partnership liabilities and treated as a distribution of money under sec. 752(b)? And if the property thereafter should increase in value, so that its value exceeds the amount of the encumbrance, is there a contribution under sec. 752(a)? 1 W. McKee, W. Nelson, and R. Whitmire, Federal Taxation of Partnerships and Partners, par. 7.04, pp. 7–12—7–13 (1977); 1 A. Willis, Partnership Taxation, sec. 22.09, pp. 262–263 (2d ed. 1976); A. Aronsohn, "The Financially Troubled Partnership," 34th Ann. N.Y.U. Inst. Fed. Tax. 327, 349–351 (1976); M. Ginsburg, "The Leaky Tax Shelter," 53 Taxes 719, 731 (1975). For a different view, see J. McGuire, "Negative Capital Accounts and the Failing Tax Shelter," 3 J. Real Est. Tax. 439 (1976).

in the petitioners' bases, permitting them to deduct, under section 704(d), their distributive shares of partnership losses. Had the petitioners not been able to include such amounts in their bases, their losses would have been limited to their capital contributions, which were minimal. It follows that the petitioners must, upon the disposition of their partnership interests, include in the amount realized the full amount of the nonrecourse liability.[13]

We must also decide whether the petitioners are entitled, under the provisions of the Civil Rights Attorney's Fees Awards Act of 1976, Pub. L. 94–559, 90 Stat. 2641, amending 42 U.S.C. sec. 1988, to an award of attorney's fees. Such Act authorizes an award of attorney's fees only to a prevailing party (other than the United States). The petitioners point out, however, that an addition to tax for negligence was determined against Mr. and Mrs. Tufts, and later was conceded by the Commissioner. They assert that at least as to Mr. and Mrs. Tufts we should make an allowance for attorney's fees.

This Court has no authority to award attorney's fees unless specifically authorized to do so by act of Congress. See *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240 (1975). We have held that we are not authorized by the provisions of the Civil Rights Attorney's Fees Awards Act of 1976, or any other law, to award attorney's fees to a petitioner. *Key Buick Co. v. Commissioner,* 68 T.C. 178 (1977), on appeal (5th Cir., Aug. 15, 1977). As we are without authority to award attorney's fees in any case, we need not consider whether Mr. and Mrs. Tufts' case would be an appropriate case for such an award, or whether the amount claimed is reasonable.

*Decisions will be entered under Rule 155.*

---

[13]We do not pass upon whether nonrecourse liabilities in excess of the fair market value of the property securing such liabilities are inlcuded in the basis of a partnership interest acquired by purchase. Compare *Bolger v. Commissioner,* 59 T.C. 760, 769–771 (1973); *Mayerson v. Commissioner,* 47 T.C. 340, 351–354 (1966); *Blackstone Theatre Co. v. Commissioner,* 12 T.C. 801, 804 (1949), with *Morris v. Commissioner,* 59 T.C. 21, 33–34 (1972); see 1 W. McKee, *supra* at 7–14—7–15.