TEMPLETON BRIGGS, JR. and DORI R. BRIGGS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Briggs v. Commissioner
Docket No. 1481-78.
United States Tax Court
T.C. Memo 1979-218; 1979 Tax Ct. Memo LEXIS 306; 38 T.C.M. (CCH) 877; T.C.M. (RIA) 79218; May 30, 1979, Filed Templeton Briggs, Jr., pro se. James D. Vandever, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to and heard by Special Trial Judge Lehman C. Aarons, pursuant to the provisions of section 7456(c) of the Internal Revenue Code of 1954, [1] as amended, and General Order No. 6 of this Court, 69 T.C. XV. [2] The Court agrees with and adopts the Special Trial Judge's opinion which is set forth below. OPINION OF SPECIAL TRIAL JUDGE AARONS, *307 Special Trial Judge: Respondent determined deficiencies in petitioners' federal income tax for 1970, 1971, 1973 and 1974 in the respective amounts of $797.75, $1,268.18, $66.82 and $2,718.40. The only issue for the Court's decision is the deductibility of 1973 and 1974 farm losses (stemming from cattle feeding operations) in the amounts claimed by petitioners. The 1970 and 1971 deficiencies stem from the disallowance of a net operating loss carryback, and our determination as to the claimed 1973 and 1974 losses will automatically control the disposition of the carryback issue.
FINDINGS OF FACT Many of the facts were stipulated by the parties and are so found. We will summarize below only those facts necessary to an understanding of this opinion. Petitioners (husband and wife) resided in Fullerton, California at the time of filing the petition herein. Both petitioners are teachers and their combined incomes are of modest dimensions. Until 1972 they had invested their savings conservatively. Petitioners are cash basis taxpayers. In May 1972 petitioners entered into a "Sales Agreement" with Tedlock Cattle Company, Inc. (Tedlock) under which they agreed to purchase *308 10 calves from Tedlock at $50 per calf. The calves were to be raised by Tedlock to 200 pounds, at a cost to petitioners of $50 per calf. Then they were to be transferred to a feed yard and fed for approximately 9 months, until they weighed 900 pounds, at a feed cost of $140 per calf (subject to reduction if the cost of feed declined). Petitioners agreed to pay feed yard rental not exceeding $3.60 per calf for the entire period. Each calf so purchased was to be identified. One of the provisions of the Sales Agreement provided: THE BUYER HEREBY GIVES TO TEDLOCK CATTLE COMPANY, INC., THE POWER OF ATTORNEY TO BORROW MONEY ON BEHALF OF THE BUYER TO PAY THE FEED YARD RENTAL AND FEED EXPENSE FOR THE BUYER EACH MONTH IN ADVANCE ON THE ABOVE TERMS. INTEREST ON THE BUYER'S LOAN WILL BE CHARGED TO THE BUYER AT A RATE NOT TO EXCEED.562% (.562 PERCENT) PER MONTH ON THE ACCRUED BALANCE OF THE FEED BILL AND FEED YARD RENTAL ON THE LAST DAY OF EACH MONTH DURING THE FEEDING PERIOD. THE PRINCIPAL UNDER THIS LOAN AGREEMENT WILL NOT EXCEED $1,400.00 FOR THE FEED AND FEED YARD RENTAL, AND INTEREST WILL NOT EXCEED $5.06 FOR EACH CALF. The Sales Agreement further provided: THE SELLER AGREES TO *309 NOTIFY THE BUYER WHEN THE CALVES ARE READY FOR SALE AND WILL ARRANGE FOR THE SALE OF THE CALVES AT NO COST TO THE BUYER, IF DESIRED BY THE BUYER. ALL OF BUYER'S OUTSTANDING LIABILITIES (INCLUDING LOANS) WILL BE DUE AND PAYABLE ON THE SALE OF THE FINISHED CALVES. THE SELLER AGREES TO SETTLE THESE LIABILITIES FROM THE PROCEEDS OF THE SALE AND PROVIDE AN ACCOUNTING OF THE TRANSACTION AND FORWARD ANY CASH (INCLUDING PROFIT) DUE TO THE BUYER AT THAT TIME. In June 1972 petitioners entered into a similar contract for the purchase of 90 calves. Petitioners made total cash payments to Tedlock in 1972 for purchase of calves and pre-paid feed in the amount of $10,000. Petitioners were motivated to enter into these contracts by a desire to make a large profit. The deals were not presented to petitioners primarily as tax shelters. At the maturity of the 1972 contracts (early in 1973) petitioners received from Tedlock an "Advice of Disbursement of Proceeds" with respect to each such contract. Aggregating the two "advices", they showed sales at approximately $360 per head (a total of around $36,000 for the 100 head); feed, rent, interest and other expenses of around $160 per head (totaling *310 around $16,000), and balance due to petitioners at around $200 per head (the actual total amount of the balance due and paid to petitioners on their 1972 contracts being $20,115). The "advice" showed that after offsetting petitioners' $10,000 payments for the calves and prepaid feed, they had made a profit of approximately 100 percent. Petitioners claimed, and were allowed, a $9,839 deduction on their 1972 return for their calf purchases and feed and other costs apportioned to that year. Encouraged by the results, petitioners in February, April and July 1973 entered into similar agreements with Andahl Cattle Company (Andahl), a company similar to Tedlock, operated from headquarters and sales offices located in the same building as Tedlock. These 1973 contracts covered the alleged purchase of 250 calves in the aggregate. Petitioners' payments to Andahl for the calves and prepaid feed, in 1973, aggregated $34,000. Petitioners received nothing by virtue of their 1973 contracts. A Chapter X proceeding was instituted by Tedlock's creditors in June 1974. The following summary appears in the Brief Statement by the Trustee in Reorganization. [3]
*311 Although purchaser-investors were advised that they were realizing profits on their cattle purchases, the Debtor never made a profit; its costs for purchasing and feeding cattle exceeded the price at which it agreed to sell cattle and feed to the purchaser-investors. The Debtor's only source of funds to pay purchaser-investors whose cattle were to be sold was from new investors. The supposed "profits" from sales of cattle never existed since the Debtor had not purchased the requisite number of cattle. The use of money designated for the purchase of cattle to pay obligations of previous purchaser-investors turned the entire scheme into a fraud. The trustee found, interalia, that Tedlock never acquired as many cattle as were required under its contracts, that it was "hopelessly insolvent", that it had been served with a "cease and desist order" in November 1972, but continued its activities in the name of Andahl Cattle Co., that there was no basis for a reorganization under Chapter X, and that there should be a simple liquidation in bankruptcy. In April 1977 Robert Tedlock pleaded guilty to grand theft and other charges arising out of the above obligations and was sentenced *312 to a prison term. Criminal charges were also filed against the individual who operated Andahl. On their 1973 and 1974 returns petitioners claimed farm losses of $29,646 and $34,000, respectively. Respondent allowed $14,046.58 for 1973 and none for 1974. Petitioners' actual out of pocket costs and returns were: Cash Paid by
Cash Returned to
Petitioners
Petitioners
1972 Contracts
$10,000
$20,115
1973 Contracts
34,000
0
$44,000
$20,115
leaving an out of pocket net loss of $23,885. Of this amount respondent had allowed the claimed 1972 loss in the amount of $9,839. The difference ($23,885 less $9,839) of $14,046 is the total amount which respondent allowed (for 1973) in the notice of deficiency.
Petitioners' claimed loss of $29,646 on their 1973 return was broken down (without regard to fractions of a dollar) as follows: Interest $ 733
Feed purchased
46,907
Breeding fees
25
Medicine
650
Feed pen rent
845
Prorated death loss
600
$49,760
Less sales of cattle
-20,115
Loss claimed
$29,645
These figures represent the amounts which petitioners claim that the sellers expended as their agents and on their behalf *313 in accordance with the terms of the Sales Agreements. OPINION As indicated in our Findings of Fact, petitioners have claimed net deductions stemming from the 1972 and 1973 Tedlock/Andahl cattle deals as follows: 1972
$ 9,839
1973
29,645
1974
34,000
Total
$73,484
Their total out of pocket cash payments to Tedlock and Andahl were: 1972
$10,000
1973
34,000
Total
$44,000
They received a return of $20,115 in 1973. Hence their overall net cash outlay was $23,885 ($44,000 less $20,115). The deductions allowed by respondent ($9,839 in 1972 and $14,046 in 1973) total $23,885. It is respondent's position that the entire set of deals lacked economic reality, and that beyond offsetting their net cash outlay petitioners are entitled to no further loss deductions. Petitioners read the Sales Agreement as creating an agency relationship. They contend that because of both the power of attorney vested in the sellers to borrow on their behalf and the requirement that all buyers' outstanding liabilities (including loans) be due and payable on the sale of the finished calves, they had a personal liability to the same extent that they would have *314 had if they had personally borrowed the necessary feeding costs and personally paid such funds over to the sellers. The record herein casts serious doubt upon petitioners' agency-personal liability theory. In the first place, one of the clauses of the Sales Agreement on which petitioners rely (the clause stating that their liabilities, including loans, are due and payable on the sale of the calves) provides: THE SELLER AGREES TO SETTLE THESE LIABILITIES FROM THE PROCEEDS OF THE SALE AND PROVIDE AN ACCOUNTING OF THE TRANSACTION AND FORWARD ANY CASH (INCLUDING PROFIT) DUE TO THE BUYER AT THAT TIME. The clause does not go further and provide for personal liability of the buyer for any deficiency resulting from such sale.
Beyond this, there is an absence of any indication in the record that any creditor of the seller or the trustee in its bankruptcy ever sought to enforce any such deficiency liability against petitioners or any other buyer. The record fails to indicate that any such creditor even knew about the power of attorney or ever dealt with the sellers otherwise than as principals. Nevertheless, even though there was no personal liability on the part of petitioners, *315 it might be argued that the liability to which their calves were subject is to be added to their adjusted basis for the calves, giving them the benefit of receiving deductions for their losses in excess of the out of pocket cash payments. This argument would be made under the holding in Crane v. United States,331 U.S. 1 (1947), that basis of property includes the amount of a mortgage even though the owner has assumed no personal liability. But if that argument were upheld, it would also follow that on the sale of the calves, petitioners would have received income in the amount of such non-recourse liability (thus fully offsetting their claimed excess losses). See Tufts v. Commissioner,70 T.C. 756 (1978); Millar v. Commissioner,67 T.C. 656, 660 (1977), affd. on this issue 577 F.2d 212 (3d Cir. 1978) and cases cited therein.
In our view, however, we do not reach the question of recourse versus non-recourse liability, nor of the existence or non-existence of an agency relationship. The entire set of transactions involved herein have been demonstrated to our satisfaction as having been to a large extent fictitious. There *316 is no persuasive proof that petitioners purchased the calves represented by the sellers as having been sold to them; or that feed and the other expensed items were ever purchased by the sellers for petitioners' account. There is certainly no proof that such items of expense existed in anywhere near the amounts required under the Sales Agreements. We are persuaded that the set of transactions in question was no more than a "Ponzi-like" fraudulent scheme lacking any substantial degree of economic reality. While all of this was unknown to petitioners, they cannot be permitted under such circumstances to "leverage" their losses to an amount greater than their net cash investment. Moreover, petitioners, being cash basis taxpayers, would have to present a much stronger case of agency relationship than exists in the record to be entitled to deduct expenses paid (if indeed paid at all) from moneys which never passed through their hands and which were advanced by creditors not shown to have been aware of petitioners' identity. Petitioners' unawareness of the fraud being perpetrated against them, while of course arousing our sympathy, cannot serve to create substance and reality out *317 of nothingness. Cf. Goodstein v. Commissioner,30 T.C. 1178 (1958), affd. 267 F.2d 127 (1st Cir. 1959); MacRae v. Commissioner,34 T.C. 20, 27-28 (1960), affd. 294 F.2d 56, 59 (9th Cir. 1961); Lynch v. Commissioner,273 F.2d 867, 872 (2d Cir. 1959), affg. 31 T.C. 990 (1959). In accordance with the foregoing, respondent's determinations will be sustained. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. ↩
2. Pursuant to General Order No. 6 dated March 8, 1978, the post-trial procedures set forth in Rule 182 of this Court's Rules of Practice and Procedure are not applicable to this case.↩
3. At trial petitioner raised a hearsay objection to the admission of this report of the trustee. A trustee in a bankruptcy proceeding is an officer of the court (11A Collier on Bankruptcy § 7.001 (14th ed. 1978)), and he is required by law to investigate the debtor's financial affairs and prepare a brief statement on the investigation (11 U.S.C. § 567). There is no indication in the record herein that the trustee's report is untrustworthy. Under these circumstances, we find that this document comes within the public records and reports exception to the hearsay rule, Rule 803(8), Federal Rules of Evidence.↩