STANDARD OIL COMPANY (INDI-
ANA), Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent-Appellee.

No. 71–1170.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 28, 1972.
Decided July 12, 1972.

Lee I. Park, Glenn L. Archer, Jr.,
Washington, D. C., for petitioner-appel-
lant.

Scott P. Crampton, Asst. Atty. Gen.,
Meyer Rothwacks, Chief, Appellate Sec-
tion, John A. Townsend, Grant Wiprud,
Attys., Tax Division, U. S. Department of
Justice, Washington, D. C., Johnnie M.
Walters, Asst. Atty. Gen., for respond-
ent-appellee.

Before SWYGERT, Chief Judge, and
KILEY and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Taxpayer contends that its receipts of
$597,596.49 and $606,122.22 in 1958 and
1959, respectively, were taxable as pro-
ceeds of sale, subject to capital gains
treatment, rather than as income subject
to a depletion allowance. The payments
were made on account of a potential ob-
ligation of up to $134,619,089.76, pay-
able, without interest, over an indeter-
minate period of time according to for-
mulas based upon the production of gas
from certain interests which the taxpay-
er conveyed to the obligor in 1955. The
tax treatment of the payments depends

on whether taxpayer retained an "economic interest" in the properties after the original arrangement between the parties was modified in 1958.

The tax court rejected the contention that the "economic interest" concept, as limited by the Supreme Court in Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277, does not encompass taxpayer's retained interest in the gas in place because its right to future payment does not depend "solely" on extraction of the gas. 54 T.C. 1099. As in *Anderson*, taxpayer argues that an "additional type of security for the deferred payments" converted what otherwise would have been production payments into proceeds of sale. We first state the essential facts and then our understanding of *Anderson*.

## I.

Prior to March 15, 1955, taxpayer [1] had acquired a large number of valuable oil and gas leases in the San Juan Basin in New Mexico and Colorado. Generally speaking, those leases were either for a term of years or for such period as oil or gas could be produced; taxpayer's interest was subject to a landowner's royalty on the proceeds from the sale of oil or gas produced.

On March 16, 1955, taxpayer entered into six agreements conveying certain interests in 564 of those leases to Pacific.[2] Each conveyance was limited to specified geological formations thought to be gas-bearing only. Taxpayer retained oil and gas rights in remaining formations and also the benefit of any oil that might be discovered in the specific formations covered by the agreements. No surface rights were involved.

Pursuant to the 1955 agreements, Pacific reimbursed taxpayer for its investment in facilities and productive gas

wells. In addition, Pacific agreed to pay taxpayer periodic amounts based on "the volume of gas produced and attributable to" the interests assigned to Pacific. To secure the payments, taxpayer was given a prior lien on all production from the properties. Pacific further agreed to make certain minimum payments computed on the basis of the capacity of the wells regardless of the volume of gas actually produced, and to give taxpayer the benefit of the oil content of any of the wells. It undertook to develop the gas rights at least as rapidly as it developed other properties which it had acquired in the same general area. In the event Pacific failed to meet any of its obligations, it was required to reassign its interest in the leases to taxpayer. Pacific was also entitled to reassign any portion of its rights which it determined could not be economically developed.

The 1955 agreements specifically prohibited Pacific from assigning any of its rights in the leases to any third party without the prior consent of taxpayer.

Although the witness Connor, who negotiated these agreements on behalf of taxpayer, testified that he thought he was selling real estate and that the proceeds would be taxed at capital gains rates, taxpayer's accounting department treated the payments received during 1955, 1956 and 1957 as ordinary income subject to depletion. Taxpayer does not question the propriety of that treatment of the payments received in those years. It does contend, however, that the Modification Agreements which Mr. Connor subsequently negotiated changed the character of the transaction for the period subsequent to January 1, 1958. The Modification Agreements were specifically intended to obtain a tax benefit for the taxpayer. As a business proposition, those agreements had the effect

---

1. Since consolidated returns were filed for the years involved, we use the term "taxpayer" to include Standard Oil Company (Indiana) and its subsidiary Pan American Petroleum Corporation, which was the actual party to most of the agree-

ments involved herein and which was formerly known as Stanolind Oil & Gas Company.

2. Pacific Northwest Pipeline Corporation.

of limiting the amount of money which taxpayer might receive on account of the transfer of its interests to Pacific and of granting Pacific certain additional privileges.

Under the 1955 agreements there was no limit (except that imposed by nature on the volume of gas which might be extracted economically) on the amount which taxpayer might receive from Pacific, whereas under the 1958 modification the parties agreed to a limit of $134,619,089. The original agreements flatly prohibited any transfer of Pacific's interest without the prior consent of taxpayer, whereas the modifications permitted such assignment to a third party, subject to all conditions contained in the existing agreements, provided that Pacific was required to pay to taxpayer 50% of the consideration received from any such assignment. Any such payment would be applied to reduce the balance then owed the taxpayer by Pacific.[3]

Connor testified that he had negotiated the maximum payout of $134,619,089 on the basis of actual payments which had already been made and estimates of total gas available. He had estimated that a full payout under the agreements as modified would require gas production until 1990, and that Pacific would then be left with obligation-free reserves of approximately 800,000 million cubic feet. These calculations assumed that the total amount of gas then available was over 1,800,000 million cubic feet. The tax court found that it was not possible to make a reliable determination as to the precise number of years required to pay the total consideration, but stated that a reasonable estimate would have been between 50 and 100 years. More-

over, the court found that on the basis of revised estimates of the reserves made in 1960, there would not have been a sufficient supply of gas to pay the total consideration of $134,619,089.[4]

Since the Modification Agreements gave Pacific the right to sell its interest in the leases to a third party, and since taxpayer acquired a right to receive half of the proceeds of such a sale, it contends that after January 1, 1958, it did not look *solely* to the extraction of gas for the return of its investment and it therefore no longer retained an economic interest in the leases.

The tax court considered the likelihood of sale to a third party on terms which would result in payments to taxpayer on any basis other than on account of gas production pursuant to the contract formulas as too remote to have any legal significance. In this court taxpayer argues at length that antitrust proceedings in which the parent of Pacific was involved had created a significant likelihood of a forced sale. Alternatively, taxpayer argues that under *Anderson* the degree of probability of recovery from a source other than extraction of gas is irrelevant as long as the legal instruments created such a possibility.

We have analyzed the issue in two different ways; both lead us to conclude that taxpayer retained an economic interest in the gas rights. We first assume, as taxpayer argues, that the tax court incorrectly appraised the likelihood of a sale of Pacific's interest, and further, that there is a significant possibility that such a sale would result in a substantial cash payment to taxpayer. We shall then explain why we think the re-

3. Apparently the Modification Agreements contemplated that any such payment would be made promptly, but the time of payment is not specifically stated. Moreover, Pacific was not required to pay any portion of the consideration which it might receive for any assignment to a parent or subsidiary of Pacific, or for an assignment made as a part of any corporate reorganization or merger.

4. The tax court found that during the years 1955 through 1968 not quite 118,000 million cubic feet of gas had been produced and only $9,649,329 had been paid to taxpayer. In other words, in 14 years only about 6½% of the reserves as estimated by Connor had been extracted. Nevertheless, for purposes of decision we assume that the reserves would have had a residual value to Pacific after the complete payout of $134,619,089 to taxpayer.

moteness of that possibility confirms our conclusion that taxpayer has retained an economic interest in the gas rights notwithstanding the Modification Agreements in 1958.

## II.

■ Unlike the owners of most kinds of capital assets who may recover their investment by depreciation deductions, the owner of a capital interest in minerals in place receives a depletion deduction as compensation for the disposition of his capital.[5] As long as he retains a legal interest in the wasting asset, he realizes income subject to depletion, rather than capital gains, from its disposition. Burnet v. Harmel, 287 U.S. 103, 108–109, 53 S.Ct. 74, 77 L.Ed. 199. Even if he retains no legal interest as a matter of state law, the same consequence follows if, as a matter of federal tax law, he retains an "economic interest" in a depletable asset.[6]

That term was first used in Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489.[7] In that case, the Court held that the transferor of an interest in oil leases, who received a cash bonus, a production payment, and an excess royalty, could claim a depletion deduction on the amounts received, even though he retained no legal interest in the oil as a matter of local law.

"The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital.

\* \* \* \* \* \*

"Similarly, the lessor's right to a depletion allowance does not depend upon his retention of ownership or any other particular form of legal interest in the mineral content of the land. It is enough if, by virtue of the leasing transaction, he has retained a right to share in the oil produced. If so, he has an economic interest in the oil, in place, which is depleted by production. Thus we have recently held that the lessor is entitled to a depletion allowance on bonus and royalties, although by the local law ownership of the minerals, in place, passed from the lessor upon the execution of the lease. See Burnet v. Harmel, *supra*; Bankers' Pocahontas Coal Co. v. Burnet,

---

5. Section 611(a) of the Internal Revenue Code of 1954 authorizes as a deduction in computing taxable income, in the case of oil and gas wells and other natural deposits, an allowance for depletion "in all cases to be made under regulations prescribed by the Secretary or his delegate." This allowance "is based on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit," and "is designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired." Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 312, 76 S.Ct. 395, 397, 100 L.Ed. 347.

6. Treasury Regulations on Income Tax (1954 Code) (26 C.F.R.) :
 "§ 1.611–1 *Allowance of deduction for depletion,*

\* \* \* \* \*

"(b) *Economic interest.* (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital."

7. See Sneed, The Economic Interest—An Expanding Concept, 35 Texas L.Rev. 307, 309 (1957).

287 U.S. 308, 53 S.Ct. 150, 77 L.Ed. 325." [8]

In subsequent cases, the economic interest concept was used to differentiate between capital and income transactions. If a transferor retains an "economic interest" in mineral rights, as a matter of federal tax law he has not made a sale of those rights regardless of how the transaction is classified under state law. Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 328 U.S. 25, 32–36, 66 S.Ct. 861, 90 L.Ed. 1062; see also Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 264–265, 78 S.Ct. 691, 2 L.Ed.2d 743.

In Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277, the transferee of certain royalty interests, fee interests, and deferred oil payments in property in Oklahoma contended that he had not made a purchase because the transferor had retained an economic interest in the property. The conveyance was absolute as a matter of Oklahoma law, but inasmuch as the deferred portion of the purchase price was payable from one-half of the proceeds to be received by the transferee from his disposition of the properties, he argued that the vendor continued to have an economic interest in the assets until payment was completed. Accordingly, the taxpayer claimed that the consideration paid for the assets was income to the transferor and deductible by the transferee.[9] The Supreme Court held that the Commissioner had properly disallowed the deduction because the transferor was not dependent "entirely" on production of oil for the deferred payments; they might also be derived from sales of the fee title to the land conveyed.[10]

In this case, taxpayer contends that after the execution of the 1958 Modification Agreements it was no longer dependent *entirely* on the extraction of gas for future payments by Pacific; they might also be derived from one-half of Pacific's share in the proceeds of a possible sale of the gas rights. Under the reasoning of the *Anderson* opinion, taxpayer therefore argues that the assignment privilege granted to Pacific in 1958 destroyed taxpayer's economic interest in the gas rights. Although this contention is supported by later opinions referring to the requirement that the taxpayer must look "solely" to the extraction of oil or gas for the return of his capital in order to find that he has an economic interest in the minerals in

---

8. 287 U.S. at 558, 53 S.Ct. at 226. The Court continued:

"Thus throughout their changing relationships with respect to the properties, the oil in the ground was a reservoir of capital investment of the several parties, all of whom, the original lessors, the two partnerships and their transferees, were entitled to share in the oil produced. Production and sale of the oil would result in its depletion and also in a return of capital investment to the parties according to their respective interests. The loss or destruction of the oil at any time from the date of the leases until complete extraction would have resulted in loss to the partnerships. Such an interest is, we think, included within the meaning and purpose of the statute permitting deduction in the case of oil and gas wells of a reasonable allowance for depletion according to the peculiar conditions in each case."

9. The consideration as described by the Court, was "one hundred sixty thousand dollars, payable fifty thousand in cash and one hundred ten thousand from one-half of the proceeds received by him which might be derived from oil and gas produced from the properties and from the sale of fee title to any or all of the land conveyed. Interest at the rate of 6% per annum was to be paid from the proceeds of production and of sales upon the unpaid balance." 310 U.S. at 405–406, 60 S.Ct. at 953.

10. "The reservation of an interest in the fee, in addition to the interest in the oil production, however, materially affects the transaction. Oklahoma Company is not dependent entirely upon the production of oil for the deferred payments; they may be derived from sales of the fee title to the land conveyed." 310 U.S. at 412, 60 S.Ct. at 956.

place,[11] we reject taxpayer's interpretation of the *Anderson* opinion.

Under taxpayer's interpretation, the economic interest survives as long as he has a right to be paid solely as a result of production, but the interest is extinguished if the transferor also retains a right to share in the proceeds of a possible resale. That interpretation is consistent with the fact that the alternate source of payment in *Anderson* was the proceeds of sale of the fee interests which had been conveyed as part of the package which included the mineral rights. Fairly read, however, we believe the *Anderson* opinion's reference to "additional security" contemplates reliance on a source of payment other than the depletable asset itself. As we construe the emphasis on the "fee title to the land conveyed" in *Anderson,* it attaches importance to the existence of rights in the nondepletable surface rather than to the fact that the conveyance gave the transferee complete ownership of the wasting assets.[12] A contrary interpretation would be inconsistent with Palmer v. Bender because in that case the Court held that a transfer of complete ownership as a matter of local law did not terminate the transferor's economic interest in the transferred assets. See 287 U.S. at 556–558, 53 S.Ct. 225.

Two comments in the *Anderson* opinion support this interpretation. The Court compared the economic importance of the reservation of an interest in the fee to a personal guarantee of the credit of the transferee;[13] in short, *other assets*—not merely a different disposition of the same asset—would provide security for the deferred obligation. Moreover, in its review of the facts in Thomas v. Perkins, 301 U.S. 655, 57 S. Ct. 911, 81 L.Ed. 1324, the Court noted that the transferor's right to payments solely out of production was in the nature of "a reservation from the granting clause" of sufficient oil to make the payments.[14] Such a reservation identifies the asset in which the transferor retains an economic interest; it certainly does not imply that a transferee's decision to reconvey to another producer, instead of producing himself, would impair that interest.

We therefore interpret *Anderson* as requiring that the "additional security" relate to assets other than the specific rights transferred. This interpretation is supported by persuasive authority.[15]

---

11. See Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 314, 76 S.Ct. 395, 100 L.Ed. 347.

12. The Court apparently assumed, since the burden was on the taxpayer to establish otherwise, that the interest in surface rights was significant. See part III of this opinion, *infra.*

13. "We are of opinion that the reservation of this additional type of security for the deferred payments serves to distinguish this case from Thomas v. Perkins [, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324]. It is similar to the reservation in a lease of oil payment rights *together with a personal guarantee* by the lessee that such payments shall at all events equal the specified sum." 310 U.S. at 412–413, 60 S.Ct. at 956. (Emphasis added.)

14. After stating the facts of Thomas v. Perkins in some detail, 310 U.S. at 409– 410, 60 S.Ct. at 954–955, the Court concluded (at 411, 60 S.Ct. at 955):

"Accordingly, this Court in Thomas v. Perkins decided that the provision in the lease for payments solely out of oil production should be regarded as a reservation from the granting clause of an amount of oil sufficient to make the agreed payments, and should be given the same tax consequences as a provision for oil royalties. The decision did not turn upon the particular instrument involved, or upon the formalities of the conveyancer's art, but rested upon the practical consequences of the provision for payments of that type. See Palmer v. Bender, 287 U.S. 551, 555– 557, 53 S.Ct. 225, 77 L.Ed. 489; Burnet v. Harmel, 287 U.S. 103, 111, 53 S.Ct. 74, 77 L.Ed. 199."

15. We give special deference to the views of the Fifth Circuit which has considered the issue on several occasions. See Weinert's Estate v. Commissioner of

### III.

Notwithstanding the Court's occasional use of the words "entirely" and "solely," it is also reasonable to assume that the alternate source of payout must have some substantial economic significance.[16] In the *Anderson* case the record did not disclose what portion of the transferee's gross proceeds was derived from the production and sale of oil and gas and what portion, if any, was derived from the sale of land.[17] But in that case the burden was upon the transferee taxpayer to support his claim that the entire purchase price would be paid to the transferor from the production of oil and therefore that he could exclude the amount paid from his gross income. In the absence of evidence that the surface rights were worthless, or perhaps only of nominal value, it is reasonable to infer from the form of the transaction that the parties, and the court, considered the surface rights significant.[18]

The additional security in this case, is, as a practical matter, insignificant because of the improbability that any cash will be realized from it. As we noted above, taxpayer argues at length that pending antitrust proceedings made it likely, contrary to the tax court's conclusion, that Pacific would be forced to sell its interests. Although the tax court's assessment of probabilities was adequately supported by the record before it, we accept, for the sake of argument, taxpayer's assertion that the antitrust proceedings against El Paso Natural Gas Co., which had acquired Pacific, might reasonably have led to the sale of Pacific's properties. This does not, however, mean that there is a likelihood that there will be significant cash proceeds payable to Standard. The terms of the Modification Agreements provide that the "50 percent of the proceeds" provision does not apply to assignments made by Pacific pursuant to the provisions of certain mortgages or deeds of trust or to assignments made as part of any corporate reorganization or merger or to any assignment made to a parent

Internal Revenue, 294 F.2d 750, 763–764 (1961); Commissioner of Internal Revenue v. Estate of Donnell, 417 F.2d 106, 115 (1969); Christie v. United States, 436 F.2d 1216, 1220–1221 (1971). See also Sneed, *supra*, n. 7, at 333.

16. The whole economic interest concept was developed as a substitute for technical and legalistic analysis of varying state law conveyancing requirements (see, *e. g.*, Burnet v. Harmel, 287 U.S. 103, 109–111, 53 S.Ct. 74, 77 L.Ed. 199; Bankers Pocahontas Coal Co. v. Burnet, 287 U.S. 308, 310–311, 53 S.Ct. 150, 77 L.Ed. 325, which clearly anticipated Palmer v. Bender, 287 U.S. 551, 555–558, 53 S.Ct. 225, 77 L.Ed. 489); the concept reflects a realistic appraisal of economic risks.

"In dealing with what constitutes a sale for capital gains purposes, this Court has been careful to look through formal legal arrangements to the underlying economic realities.

\* \* \* \* \*

"In Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324, . . . . [the] risks run by the transferor of making or losing money from the oil were shifted so slightly by the transfer that no § 1222(3) sale existed, notwithstanding the fact that the transaction conveyed title as a matter of

state law, and once the payout was complete, full ownership of the minerals was to vest in the purchaser." Commissioner of Internal Revenue v. Brown, 380 U.S. 563, 585, 85 S.Ct. 1162, 1173, 14 L.Ed.2d 75 (Mr. Justice Goldberg dissenting).

See also Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 328 U.S. 25, 34–35, 66 S.Ct. 861, 90 L.Ed. 1062.

17. See 310 U.S. at 406–407, n. 3, 60 S.Ct. at 953. The Court said that "[t]he record does not indicate what portion of the gross proceeds was derived from production and sale of oil and gas and what portion, if any, was derived from sales of fees and from royalties on leases." *Id.* It was agreed that the amount in dispute—the amount the transferee taxpayer attempted to exclude from his gross income—all came from oil production. The Court thus apparently recognized that part of the payment made, which exceeded the claimed deficiencies, might have come from proceeds of sales of the fee which the taxpayer did not attempt to exclude and which was, therefore, not part of the dispute before the Court.

18. The court stated that the reservation of an interest in the fee "materially affects the transaction." 310 U.S. at 412, 60 S.Ct. 952, quoted in note 10, *supra.*

or subsidiary corporation of Pacific. Thus, there is ample flexibility to structure a retransfer to satisfy both the antitrust laws and the exclusionary language of the Modification Agreements. The total $134,000,000 obligation is interest free. It is improbable that Pacific and an arm's length buyer would agree on terms which would include the payment of a significant amount of cash to obtain the premature discharge of an interest free obligation.

 Thus, for two independent reasons, we hold that taxpayer's reliance on *Anderson* is misplaced. First, the possibility that Pacific's interest in the gas rights conveyed to it by taxpayer will be resold to a third party and a share of the sale proceeds paid to taxpayer does not diminish—or extinguish—taxpayer's economic interest in those gas rights; the value of its right to deferred payments is dependent "solely" and "entirely" on the expectation of future production or conversely, on the risk of nonproduction before it has received a full payout of $134,619,089. Furthermore, the "additional security" in this case does not meet the requirement of "significance" which we believe the rationale of *Anderson* requires. The record persuades us that the possibility of a purchase of Pacific's rights by a third party on terms which would in fact give the taxpayer any accelerated recovery is too remote to be considered significant or substantial.

We therefore hold that taxpayer's economic interest in the gas formations in the San Juan Basin, which was retained notwithstanding the conveyances to Pa-

cific in 1955, also survived the 1958 Modification Agreements.[19] The judgment of the tax court is affirmed.

---

19. In *Anderson* the Court explained that the application of the economic interest concept to the fee interests would produce "double depletion." Accordingly, the parties in this case have argued at some length the question whether double depletion would follow a sale of Pacific's rights to a third party. Assuming the existence of such a possibility, we do not consider it of vital importance to the question we have decided. The government argues that since any amount paid by a third party to purchase Pacific's interest would be based on anticipated production, that the portion which Pacific pays to Standard should be considered as an acceleration of the third party's payments to Standard through Pacific as a conduit and be treated in the same manner as advance royalties. Thus, 50 percent of the purchase price would be excludable from the third party's gross income and would be subject to depletion allowance in the hands of Standard. At this time, we express no opinion on the government's proposed treatment of a tax situation based on a contingency that will probably never come to pass.