**GIBSON PRODUCTS CO.—Kell Blvd., Plaintiff-Appellant,**

**v.**

**UNITED STATES of America, Defendant-Appellee.**

**No. 79-2374.**

United States Court of Appeals, Fifth Circuit. Unit A

Feb. 23, 1981.

[redacted]

Robert I. White, Houston, Tex., for plaintiff-appellant.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Chief, Appellate Sec., Ann Belanger Durney, Karl P. Fryzel, Tax Div., Dept. of Justice, Washington, D. C., Kenneth J. Mighell, U.S. Atty., Fort Worth, Tex., for defendant-appellee.

Before WISDOM, GARZA and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

This is a taxpayer's refund suit under 28 U.S.C. § 1346(1). Gibson Products Company, an accrual basis taxpayer, appeals from a judgment denying it recovery of $25,-414.48 in taxes and interest which it alleges were erroneously assessed and collected by the Government for the 1972 tax year. Gibson Products contends that the district court erred in sustaining the disallowance by the Commissioner of Internal Revenue for the deduction, as an intangible drilling expense in 1972, of taxpayer's pro rata share of liability on a nonrecourse note given in that year by a limited partnership, in

which it was a limited partner, in exchange for a "no-out" turnkey drilling contract on some oil and gas prospects owned by the partnership. We affirm the judgment of the district court.

## I. *Background*

The factual details are fully set out in the district court's opinion. *Gibson Products Co. v. United States*, 460 F.Supp. 1109 (N.D. Tex.1978). The following facts are significant for purposes of this appeal.

In 1972 Gibson Products, a Texas corporation, invested in a limited partnership known as the "McNeil Street Drilling Venture—72." McNeil Street consisted of two general partners, Robert Pace and Harold Rogers, and thirteen limited partners including Gibson Products. Gibson Products' cash contribution to the McNeil Street partnership was $25,000, equaling 8.06% of the total capitalization.

McNeil Street subsequently entered into a joint venture with the Midwest Drilling Venture to acquire certain oil and gas leases. McNeil possessed a 59% participating interest in the joint venture, and Midwest had a 41% interest. On December 29, 1972, the McNeil/Midwest joint venture entered into an agreement with Galaxy Oil Company to purchase five oil and gas leases. The leases were purchased for $63,500, of which $25,400 was paid in cash with the balance of $38,100 being satisfied by a nonrecourse promissory note.

As part of the purchase of these oil and gas leases, McNeil/Midwest entered into a "no-out" turnkey drilling contract[1] with Galaxy Oil, whereby Galaxy agreed to drill an exploratory test well on each of the five leases commencing on or before January 31, 1973. The consideration for the drilling contract equalled $1,036,500, of which $414,-600 was paid in cash and the balance of $621,900 was included in the nonrecourse note. Consequently, the McNeil/Midwest joint venture paid a total of $1,100,000 for the five oil and gas leases plus the drilling

contract, of which $440,000 or 40% was paid in cash and the remaining $660,000 or 60% was paid by the nonrecourse note.

The promissory note in the amount of $660,000, dated December 29, 1972, was payable on January 1, 1977 with 6½% interest per annum. Galaxy's sole recourse for nonpayment was determined by the terms of the mortgage and security agreement entered into by the parties on the same date. According to that agreement, the collateral securing the $660,000 note consisted of the five oil and gas leases, any operating equipment on the leases owned by McNeil/Midwest, and 80% of any future oil and gas production from wells completed on the leases. Part of the mortgage agreement consisted of an assignment by the McNeil/Midwest joint venture to Galaxy Oil of 80% of all oil and gas produced from the lease prospects. The agreement provided that the proceeds from any oil and gas production would be applied as follows: (1) to satisfy any expenses incurred by Galaxy in connection with collection, (2) to payment of accrued interest on the nonrecourse note, and (3) to payment of the principal on the note. Moreover, under the terms of the loan agreement entered into on the same date, Galaxy was given the option, once drilling had been completed to the agreed depth and if McNeil/Midwest elected to complete any of the wells thus drilled, to enter into a joint venture arrangement with McNeil/Midwest for completion of any particular well and to share in the well's ownership, development and operation with a 20% participating interest.

McNeil Street's pro rata contribution (51%) to the consideration given to Galaxy Oil for the leases and drilling contract consisted of $244,614 in cash and $366,921 on the nonrecourse note. McNeil Street, an accrual basis partnership, claimed $611,535 ($244,614 plus $366,921) on its 1972 partnership return as intangible drilling and devel-

---

1. Under a "no-out" turnkey drilling contract, the drilling contractor in consideration for the contract price undertakes to drill a test well to the casing point (the agreed depth), and he assumes the full risk and expense of drilling the well to the specified depth.

opment costs,[2] which it elected to deduct as expenses under I.R.C. § 263(c) [26 U.S.C. § 263(c)] and Treas.Reg. § 1.612–4(a). On its 1972 tax return, McNeil Street claimed a total loss of $661,760, including the $611,535 in intangible drilling and development costs. Gibson Products' pro rata share (8.06%) of the partnership's losses attributable to intangible drilling costs figured out to be $49,317.34,[3] which it in turn claimed as a deduction on its 1972 tax return. Although a partner cannot deduct partnership losses that exceed his basis in the partnership, I.R.C. § 704(d) [26 U.S.C. § 704(d)], a partner's basis includes not only the money contributed to capitalization, but also his pro rata share of nonrecourse liabilities incurred by the partnership. Treas.Reg. § 1.752–1(e). Taxpayer argues that since McNeil Street was a comaker on the nonrecourse note to Galaxy Oil, it was entitled to an increase of its partnership basis by a proportionate amount, i. e. by 8.06% of 59% of $660,000 equaling $31,403.23. By adding this figure to its cash contribution of $25,000, Gibson Products concludes that its basis in the partnership was $56,403.23. Therefore, taxpayer contends it was entitled to deduct its full pro rata share of McNeil Street's losses, including its share of the partnership's intangible drilling and development costs ($49,317.34).

After examining the McNeil Street partnership return for 1972, the Internal Revenue Service disallowed the deduction of $611,535 as intangible drilling costs. Accordingly, taxpayer's deduction of $49,-317.34 as intangible drilling costs attributable to McNeil Street's operations was also disallowed. As a result of this disallowance, the IRS assessed and collected from Gibson Products $25,414.48 in additional taxes for 1972, the major portion of which was credited to the disallowance of the deduction of $49,317.34 for intangible drilling costs.

At trial, the Government made two arguments in support of the disallowance of taxpayer's deduction. First, it asserted that the nonrecourse liability of McNeil/Midwest to Galaxy Oil was contingent upon oil and gas production and was, therefore, not accruable as a debt to McNeil Street in 1972 under the "all-events" test.[4] Second, the Government contended that taxpayer's basis in McNeil Street could not be increased by its proportionate share of the partnership's nonrecourse liability to Galaxy under the *Crane* doctrine.[5]

■ The district court held first that taxpayer was entitled to deduct its proportionate share of McNeil Street's loss attributable to the cash payment made to Galaxy for the drilling obligations, but that the amount of the deduction would be limited to taxpayer's basis in the partnership.[6] Then after examining the substance of the transaction, as opposed to its form, the district court made a factual determination that McNeil Street's liability to Galaxy on the nonrecourse note was contingent upon future production of oil and gas from the five

---

**2.** Intangible drilling and development costs include expenditures for "labor, fuel, repairs, hauling and supplies," which are used by the owner of a working interest in an oil and gas lease to drill wells and prepare them for mineral production, or which are paid by the owner to a contractor for such use. Treas.Reg. § 1.612–4(a).

**3.** By our calculations 8.06% of $611,535 equals $49,289.72, not $49,317.34.

**4.** *See United States v. Anderson*, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926); *Lawyers' Title Guaranty Fund v. United States*, 508 F.2d 1 (5th Cir. 1975); Treas.Reg. §§ 1.446–1(c)(1)(ii), 1.461–1(a)(2).

**5.** *Crane v. Commissioner of Internal Revenue*, 331 U.S. 1, 12–14, 67 S.Ct. 1047, 1053–54, 91 L.Ed. 1301 (1947).

**6.** The Government conceded this to be the proper treatment for the cash portion of McNeil Street's payment to Galaxy for the drilling contract. The reason the IRS initially disallowed the deduction for the cash payment to Galaxy was the asserted "lack of a bona fide business purpose for the large cash payment in 1972 where the wells were not to be drilled until the following year." *Gibson Products Co.*, 460 F.Supp. at 1113 n.4. McNeil Street's share of the cash payment to Galaxy was $244,614 (59% of $414,600). Gibson Products' pro rata share of the cash payment was $19,-715.89 (8.06% of $244,614).

leases. Based on that factual determination, the district court drew the legal conclusion that the requirements of the "all-events" test for accrual basis accounting, which would allow taxpayer to deduct its pro rata share of the note attributable to the drilling contract as an intangible drilling cost, had not been met. Finally, the court held that taxpayer could not increase its basis in McNeil Street by an amount equal to its prorata share of the nonrecourse note to Galaxy because: (1) liability on the note was contingent, and/or (2) taxpayer had failed to prove in accordance with I.R.C. § 752(c) [26 U.S.C. § 752(c)] and Treas.Reg. § 1.752–1(e) that the value of the collateral securing the debt equalled the amount of the note.[7]

■ While this case was pending on appeal, the Tax Court rendered its decision in *Brountas v. Commissioner of Internal Revenue*, 73 T.C. 491 (1980). In *Brountas*, the Tax Court held, under facts identical to those *sub judice* in every relevant respect, *see* 73 T.C. at 534–38, that nonrecourse notes payable to the drilling contractor/lender, from whom the mineral leases were purchased, constituted production payments or the substantial economic equivalent thereto under I.R.C. § 636 [26 U.S.C. § 636] and Treas.Reg. § 1.636–3(a)(2). Since § 636 provides that a production payment be treated as a loan, the Tax Court concluded that the nonrecourse notes given in exchange for turnkey drilling contracts and secured by future mineral production could be deducted as intangible drilling and development costs, irrespective of the highly contingent nature of liability thereon and without regard to whether such liability accrued in the year of deduction under the "all-events" test. Taxpayer urges us to follow the reasoning of the Tax Court in *Brountas* and hold that the nonrecourse note to Galaxy is a production payment, which § 636 requires to be treated as a loan, and that as such it is deductible as an intangible drilling cost. We decline to do so for reasons set forth below.

Before we deal with the production payment argument, however, we will first consider the question of whether liability on the nonrecourse note accrued to the McNeil Street partnership in 1972 under the "all-events" test. Moreover, because we decide that the liability on the nonrecourse note was contingent upon oil and gas production and, therefore, not a true liability recognizable as a partnership loss, we need not determine whether the district court was correct in concluding that Gibson Products could not increase its basis in the McNeil Street partnership by an amount equal to its proportionate share of the note to Galaxy.[8] It is sufficient to note that Gibson

---

7. We note, as did the district court, that the tax law to be applied in resolving the issues in this case is the law that existed in 1972. The changes in the law occasioned by the Tax Reform Act of 1976, *see* I.R.C. § 465 [26 U.S.C. § 465], have no retroactive application. Pub.L. No. 94–455, § 204(c)(1) (1976).

8. While not deciding the issue, we regard the district court's reasoning persuasive in concluding that the nonrecourse indebtedness of a partnership can be included in a partner's basis *only to the extent that it equals or exceeds the* market value of the property securing the debt. Taxpayer argues that the district court's conclusion in this regard is contrary to the Tax Court's decision in *Tufts v. Commissioner of Internal Revenue*, 70 T.C. 756 (1978), *appeal pending* (5th Cir. No. 79–2258) and the Third Circuit's decision in *Millar v. Commissioner of Internal Revenue*, 577 F.2d 212 (3d Cir.), *cert. denied*, 439 U.S. 1046, 99 S.Ct. 721, 58 L.Ed.2d 704 (1978). Although in *Tufts* the Tax Court made the broad statement that, based on the legislative history of § 752 and the regulations promulgated pursuant thereto, it concludes "that Congress intended the fair market value limitation of subsection (c) to apply only with respect to the contribution or distribution of encumbered property, or with respect to amounts treated as such contributions or distributions . . .," 70 T.C. at 769, the court in *Tufts* clearly indicated that it was *not* passing upon the question of "whether nonrecourse liabilities in excess of fair market value of the property securing such liabilities are included in the basis of a partnership interest acquired by purchase." 70 T.C. at 770 n.13.

Both *Tufts* and *Millar* are tax benefit cases. *Tufts* involved the *sale* of a partnership asset and the application of the tax benefit principle to a situation where partners had already received the tax benefit of increasing their bases to the full extent on a nonrecourse liability, which exceeded the fair market value of the property securing such liability, and where those partners attempted to claim that under

Products' basis in McNeil Street ($25,000) is more than enough to cover its distributive share of partnership loss resulting from the cash payment on the drilling contract to Galaxy.[9]

### II. McNeil Street's Deduction of the Nonrecourse Note

An accrual basis taxpayer is entitled to deduct an item in the year in which all events necessary to determine both the fact and the amount of liability have occurred. *United States v. Anderson*, 269 U.S. 422, 441, 46 S.Ct. 131, 134, 70 L.Ed. 347 (1926); *Lawyers' Title Guaranty Fund v. United States*, 508 F.2d 1 (5th Cir. 1975); Treas.Reg. §§ 1.446–1(c)(1)(ii), 1.461–1(a)(2). The application of the "all-events" test "requires a factual determination, dependent upon and determined by the facts of the individual case." *Subscription Television, Inc. v. Commissioner of Internal Revenue*, 532 F.2d 1021, 1027 (5th Cir. 1976).

Upon the record before us, we cannot say that the district court was clearly erroneous, Fed.R.Civ.P. 52(a), in concluding from its examination of the substance of the transaction, as opposed to its form, "that the only event which would trigger McNeill [sic] Street's liability was the future oil and gas production," and that "[i]f the drilling efforts proved to be unsuccessful, McNeill [sic] Street would in fact be no more liable to Galaxy for any further amounts than if it had never entered the lease purchase and turnkey drilling agreement." [10] 460 F.Supp. at 1114. Moreover, we doubt that the district court could have made any finding to the contrary on the facts of this case.

In *Sunburst Oil & Refining Co. v. Commissioner of Internal Revenue*, 23 B.T.A. 829 (1931), which was relied upon by the court below, the Board of Tax Appeals held that a taxpayer's liability under a drilling contract for expenses of drilling and opera-

§ 752(c) the amount realized from a sale of the encumbered property was limited to the fair market value of that property, not the amount of the liability. The Tax Court noted that under the partners' reading of § 752(c), they were permitted to include in their bases the full amount of nonrecourse liability, with the result that they were entitled to deduct it as a partnership loss. However, the court reasoned, if they were permitted to exclude a portion of such liability from the amount realized upon disposition of partnership property because the fair market value of that property, which secured the nonrecourse liability, was less than the amount thereof, then they could avoid accounting for such deductions upon disposition of the property, "a result *Crane* sought to prohibit." 70 T.C. at 769.

In *Millar* there was, resulting from a foreclosure, a surrender of stock owned by taxpayers in exchange for the cancellation of a nonrecourse obligation. The fair market value of the stock, which was collateral for the nonrecourse debt, was less than the amount of the liability. While not personally liable upon the loan, the taxpayers used the funds obtained by the loan to increase the basis of their stock, which permitted them to take sizable deductions. In holding that the fair market value limitation— enunciated by the Supreme Court in footnote 37 of *Crane*—was inapplicable to these facts, the court in *Millar* stated:

"Having substantially reduced the adjusted basis of their stock in this manner and thereafter surrendering their devalued stock in exchange for the cancellation of their indebted-

ness, the taxpayers clearly realized taxable gain equal to the value of the cancelled obligation, less the adjusted basis of their surrendered stock. A finding that the taxpayers did not realize gain as a result of this exchange, after having realized the full economic benefit of this transaction, would entitle them to the type of double deduction of which the Supreme Court so clearly disapproved in *Crane*."

577 F.2d at 215.

9. *See* I.R.C. § 704(d) [26 U.S.C. § 704(d)], which provides that a partner's distributive share of partnership loss shall be recognized only to the extent of his basis in the partnership. Gibson Products' distributive share of partnership loss (as an intangible drilling expense) allocable to the cash portion of the payment on the drilling contract to Galaxy is $19,715.89. *See* footnote 6, *supra*.

10. The district court noted that the testimony of Robert Pace, a general partner in McNeil Street and the principal negotiator of the transaction, substantiated the IRS' contention that liability on the nonrecourse note was contingent upon production of oil and gas from these wildcat wells. Pace testified in no uncertain terms "that the wells had to be good before Galaxy would be paid on the note" and "[i]f the wells had been dry . . . Galaxy would not have received all of their money on the note." 460 F.Supp. at 1114.

tion of oil and gas wells was contingent and not accruable since payment was to be made solely from the taxpayer's share of production from the wells. Although the amount of liability was fixed, the fact of liability would occur only "if and when sufficient oil was produced from the wells to pay for it." 23 B.T.A. at 836. The district court explained that "[a]lthough the lease purchase and turnkey drilling agreement in the present case differs from the agreement in *Sunburst Oil* in that payment of the drilling price itself [in this case] was not expressly [by the terms of the contract] made conditional upon production, the court does not believe that this distinction is controlling." 460 F.Supp. at 1114. We agree because the district court, in looking to the substance of the transaction, found that the parties understood and contemplated that payment of the balance of the drilling contract ($660,000) was conditional upon production of oil and gas from these wildcat wells.[11] The record clearly supports a finding that Galaxy would be paid on the note only "if and when sufficient oil was produced" from the test wells.

One legal scholar in the field of taxation and nonrecourse financing of oil and gas exploration activities comments that "[t]here is a danger in concluding ... that since some nonrecourse loans have been treated as the economic and financial equivalent of true loans, we may perhaps too easily assume that all nonrecourse loans are *ipso facto* the equivalent of true loans." Fielder, "Drilling Funds and Nonrecourse Loans—Some Tax Questions," 24th Southwestern Legal Foundation Inst. on Oil & Gas Taxation 527, 537 (Matthew Bender & Co. 1973) [hereinafter cited as Fielder]. Professor Fielder makes this observation:

> "If a financing arrangement is structured under which funds are advanced by an ostensible lender to an operator as ostensible borrower, who is to conduct exploration and development activities on an unexplored and unproven oil and gas prospect and in which recourse for repayment

of the loan is limited to the oil and gas prospect as the burdened property, the transaction may be so lacking in the essential characteristics, economic realities, and financial expectations of a true lending transaction as to call for reclassification of the transaction as one other than a loan and ascribing to it consequences for tax purposes other than those growing out of a true loan."

Fielder, *supra* at 538.

■ We conclude on this record that the nonrecourse note from the McNeil/Midwest joint venture to Galaxy was not a true loan. In a true lending transaction, the borrower normally possesses assets nearly equal or greater in value than the amount of indebtedness, whether or not those assets are hypothecated to secure the debt. In addition, the lender usually expects the borrower to maintain those assets at such a level until the obligation is satisfied. Fielder, *supra* at 534. Moreover, in a true lending transaction, there exists the reasonable likelihood that the lender will be repaid in light of all reasonably foreseeable risks. In other words, there must be "a reasonable basis for the prediction that the ability of the borrower to repay will not be wholly or substantially contingent upon the success or failure of the business venture." *Id.* The transaction between Galaxy and McNeil/Midwest cannot be considered a true debt because the borrower (McNeil/Midwest) in 1972 could foresee its inability to repay the loan on January 1, 1977, unless the wildcat wells produced the repayment.

The single most important factor dictating our conclusion that the transaction between Galaxy and McNeil/Midwest was not a true loan is the fact that the total combined assets of both joint venturers were not sufficient to pay the note on or before the maturity date, even if McNeil/Midwest was so inclined, absent production from any of the leases. For example, there is no

---

11. The term "wildcat well" denotes "[a]n exploratory well being drilled in unproven territory, that is, in a horizon from which there is no

production in the general area." Williams & Meyers, *Manual of Oil and Gas Terms*, p. 653 (4th ed. 1976).

evidence in this record that McNeil/Midwest possessed any assets other than the five oil and gas leases (valued at $63,500) and the turnkey drilling contract with Galaxy. Furthermore, the district court concluded that it had not been proven, on a reasonable basis, that the value added to the leases by the drilling contract would be commensurate with its price ($414,600 in cash plus $621,000 on the nonrecourse note),[12] apart from the production of oil and gas from any of the leases. While we concede that a drilling contract itself is a valuable right, which may enhance the value of a lease before the completion of drilling,[13] we do not believe that the value of the five leases enhanced by the turnkey drilling contract was of such a tangible, intransitory nature in 1972 that it could be considered a manifestation of a true loan. It is self-evident that the enhancement value of an exploratory drilling contract will change when the well is completed, after which the value of the mineral property will either soar or plummet depending upon the results of the drilling. In a true loan it is contemplated that the borrower will *maintain* assets equal or greater in value than the amount of the debt. However, even assuming for the moment that the leases securing the note to Galaxy were worth $1,100,000 in 1972 (the combined drilling contract and purchase price), they would have little or no value if all five test wells turned out to be dry holes. Of course, we do recognize that even if the five test wells were dry holes, the mineral leases might again become valuable at some future date if oil or gas were discovered after additional drilling at other depths and horizons.

Another characteristic of a true loan is that the "borrower, exclusively, is entitled to all of the entrepreneurial rewards and gains from the application and investment of the loan proceeds and the lender is entitled to none of them as such." Fielder, *supra* at 535. A corollary to this is that the "lender is entitled to receive repayment of only the funds advanced plus reasonable interest." *Id.* Here, instead of the borrower (McNeil/Midwest) being exclusively entitled to all of the entrepreneurial rewards and gains from application and investment of the loan proceeds, the lender (Galaxy) was entitled to share in the investment of the loan proceeds along with the borrower. As part of the loan agreement, Galaxy was given an option to enter into a joint venture with McNeil/Midwest for completion of any well and to share in the profits therefrom with a 20% participating interest. Therefore, Galaxy, as the lender in this transaction, was entitled to receive more than mere repayment of the funds advanced plus interest, and McNeil/Midwest, as the borrower, would not exclusively enjoy all the entrepreneurial rewards from the investment of the "loan" proceeds.

The principal cases dealing with the problem of nonrecourse loans and taxation have involved situations in which the property securing the nonrecourse note "was real and personal property of a durable nature," which (1) possessed "an objectively ascertainable present value at least equal to the amount of the indebtedness" along with "a reasonably predictable future value . . . reasonably certain to remain at least equal to the amount of indebtedness," and (2)

---

12. The district court did find that the price of $1,036,500 for a no-out turnkey drilling contract on the leases was reasonable. Testimony by expert witnesses revealed that between $400,000 and $500,000 would cover the bare minimum costs of drilling the five exploratory wells on a turnkey basis, assuming there was no trouble on any of the wells. The remaining $500,000 to $600,000 on the contract constituted Galaxy's risk and profit margin.

In addition to any profit it would make on the drilling contract, plus its option to enter into a joint venture with McNeil/Midwest on a 20% participating basis for the completion of a pro-

ducing well on any of the leases, Galaxy had a further incentive to enter into the turnkey drilling contract because it possessed options to purchase a one-half mineral interest in extensive amounts of acreage surrounding the five oil and gas leases sold to McNeil/Midwest. Upon the discovery of oil on any of the five leases, Galaxy would exercise its option on the surrounding acreage and become a half owner of a more valuable mineral prospect.

13. *See* Treas.Reg. § 1.612–2(d)(2)(i) (drilling cost as an improvement on mineral property would be includable for ascertaining basis).

"was relatively immune to or which might be insured against sudden developments [that] might reduce the value of the property below the amount of the unpaid indebtedness."[14] *See* Fielder, *supra* at 537.

We, therefore, hold that the transaction between McNeil/Midwest and Galaxy was so lacking in the essential characteristics, economic realities, and financial expectations of a true lending transaction, that it must be reclassified for tax purposes as a transaction other than a true loan.

Our holding—that since McNeil Street's debt to Galaxy was contingent upon oil and gas production, all events had not transpired in 1972 to determine the fact of liability on the nonrecourse note—is supported by language of the Tax Court in *Brountas v. Commissioner.* There, when faced with facts identical to those before us in every relevant respect, the Tax Court stated:

> "Leaving aside for the moment the provisions of section 636, [dealing with production payments] we would consider it highly doubtful that a pre-drilling production payment on an exploratory or so-called wildcat well, even when cross-collateralized with other wildcat wells, or any similar nonrecourse, highly contingent obligation would be a 'liability' for purposes of section 752(a)."

73 T.C. at 559.

Although noting that the "all-events" test and contingency arguments were energetically asserted by the IRS in *Brountas,* the Tax Court failed to reach those arguments since it deemed the nonrecourse obligations therein to be production payments, which are deemed as loans under § 636 and treated as legal liabilities regardless of whether payment is speculative. 73 T.C. at 558–59 & n.73, 569–70 nn.84 & 85. We now turn to this issue.

### III. *The Nonrecourse Note: Production Payment?*

In *Brountas v. Commissioner,* two taxpayers had invested in limited partnership drilling ventures. These limited partnerships purchased several oil and gas prospects and then entered into drilling contracts with the sellers, whereby the sellers agreed to drill exploratory wells on a turnkey basis. As in the instant case, the limited partnerships in *Brountas* paid for 60% of the cost of the leases and drilling contract with nonrecourse notes. There, as here, the nonrecourse notes were secured by future production of oil and gas from unexplored and unproven leases. The ultimate issue in *Brountas* was whether the limited partners could deduct their proportionate share of the nonrecourse notes as intangible drilling costs. The Tax Court held the drilling contract indebtedness could be deducted, concluding that the nonrecourse notes constituted production payments which must be treated as true loans regardless of their contingent nature. 73 T.C. at 569–70.

In the Tax Reform Act of 1969, Congress provided that production payments are to be treated as loan transactions, that is, a mortgage loan by the owner of the production payment to the owner of the mineral property. I.R.C. § 636 [26 U.S.C. § 636].[15]

14. *See, e. g., Crane v. Commissioner,* 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947); *Parker v. Delaney,* 186 F.2d 455 (1st Cir. 1950); *Bolger v. Commissioner of Internal Revenue,* 59 T.C. 760 (1973); *Mayerson v. Commissioner of Internal Revenue,* 47 T.C. 340 (1966); *Blackstone Theater Co. v. Commissioner of Internal Revenue,* 12 T.C. 801 (1949).

15. I.R.C. § 636 [26 U.S.C. § 636] provides in pertinent part:

 (a) CARVED–OUT PRODUCTION PAYMENT.—A production payment carved out of mineral property shall be treated, for purposes of this subtitle, as if it were a mortgage loan on the property, and shall not qualify as an economic interest in the mineral property. In the case of a production payment carved out for exploration or development of a mineral property, the preceding sentence shall apply only if and to the extent gross income from the property (for the purposes of section 613) would be realized, in the absence of the application of such sentence, by the person creating the production payment.

 (b) RETAINED PRODUCTION PAYMENT ON SALE OF MINERAL PROPERTY.—A production payment retained on the sale of a mineral property shall be treated, for purposes of this subtitle, as if it were a purchase money mortgage loan and shall

In holding that the nonrecourse notes were production payments under § 636, the Tax Court in *Brountas* relied upon the definition of "production payment" set forth in Treas. Reg. § 1.636–3(a), which provides in pertinent part:

"(1) The term 'production payment' means, in general, a right to a specified share of the production from mineral in place (if, as, and when produced), or the proceeds from such production. Such right must be an economic interest in such mineral in place. It may burden more than one mineral property, and the burdened mineral property need not be an operating mineral interest. Such right must have an expected economic life (at the time of its creation) of shorter duration than the economic life of one or more of the mineral properties burdened thereby. *A right to mineral in place which can be required to be satisfied by other than the production of mineral from the burdened mineral property is not an economic interest in mineral in place.* A production payment may be limited by a dollar amount, a quantum of mineral, or a period of time. . . .

(2) *A right which is in substance economically equivalent to a production payment shall be treated as a production payment for purposes of section 636* and the regulations thereunder, *regardless of* the language used to describe such right, the method of creation of such right, or *the form in which such right is cast* (even though such form is that of an operating mineral interest). Whether or not a right is in substance economically equivalent to a production payment shall be determined from all the facts and circumstances."

(Emphasis added.)

Specifically, the Tax Court held that the nonrecourse notes in question were production payments because they constituted rights which were "in substance economically equivalent" to production payments. 73 T.C. at 567. By relying on § 1.636–3(a)(2), the Tax Court indicated it was avoiding the issue of whether the presence of additional security as a source of repayment is sufficient to preclude characterization of the nonrecourse notes as production payments. The Tax Court had perceived a "split in authority on whether characterization of an obligation as a production payment is precluded by even a remote and economically insignificant alternative nonmineral source of payment, or only by an alternative source of economic significance." [16] 73 T.C. at 565. The Tax Court held that, regardless of whether the notes were production payments under the historical definition of § 1.626–3(a)(1) (because of the added collateral of the mineral leases and the equipment on the leases), the nonrecourse notes were the economic equivalent of production payments under § 1.636–3(a)(2) since the added security of the mineral leases themselves and any equipment thereon was nominal in value.[17] 73 T.C. at 564–65. We disagree.

The Tax Court's interpretation of subparagraph (2) of § 1.636–3(a) is contrary to the general provisions in subparagraph (1) that "[s]uch right [a production payment] must be an economic interest in such mineral in place," and that a "right to a mineral in place which can be required to be satisfied *by other than the production of mineral* from the burdened mineral property is not an economic interest in mineral in place."

not qualify as an economic interest in the mineral property.

**16.** *Compare Christie v. United States,* 436 F.2d 1216, 1220 (5th Cir. 1971) *with Standard Oil Co. (Indiana) v. Commissioner of Internal Revenue,* 465 F.2d 246 (7th Cir. 1972).

**17.** The Tax Court concluded that although the nonrecourse notes in *Brountas* were secured by other collateral in addition to mineral produc-

tion, *i. e.* the mineral leases and any equipment on the property, the alternate security for the notes was basically worthless if all the test wells were dry holes. "There would not be any worthwhile salvageable equipment on the property, and the mineral lease for a property which has yielded a negative test well is virtually worthless." 73 T.C. at 564.

(Emphasis added.) Rather than interpreting the definition so that subparagraph (2) negates subparagraph (1), we conclude that the two must be read *in pari materia,* giving reasonable effect to both parts. Therefore, we construe § 1.636–3(a)(2) to refer to a right that is, in substance, the equivalent of a production payment as defined in § 1.636–3(a)(1).

 In order for a right to be in substance the economic equivalent of a production payment, it must be satisfiable solely by production from the mineral property. *Anderson v. Helvering,* 310 U.S. 404, 412–13, 60 S.Ct. 952, 956, 84 L.Ed. 1277 (1940); Treas.Reg. § 1.636–3(a)(1). In *Christie v. United States,* 436 F.2d 1216 (5th Cir. 1971), we held that any alternative source of payment other than mineral production, even though the alternative security is only the salvage value of equipment on an oil and gas lease, will disqualify the obligation as a production payment.[18] In *Brountas,* as in the instant case, the mineral leases and any operating equipment on the property were additional security for the nonrecourse obligation and, therefore, an alternate source of repayment. The presence of such additional security materially affects the character of the payee's interest under the non-

recourse note. This is so because the maker's liability is limited to the property securing the obligation—*i. e.* the leases, equipment, and future mineral production. Therefore, if no oil and gas were produced, the debt could be discharged by foreclosure on the alternate security. Of course, a nonrecourse note could be the economic equivalent of a production payment if the only means of payment were from production. We do not decide, however, whether a production payment—or the substantial economic equivalent thereto—that is recast in the mold of a mortgage loan by the terms of § 636 is to be accorded the treatment of a true, accrued liability even if it otherwise constitutes a highly speculative and contingent obligation.[19]

We are convinced that the Tax Court has misapplied § 636 in respect to the use of nonrecourse loans in financing oil and gas exploration. The intent of Congress in enacting § 636 was to prevent taxpayers from purchasing a capital interest in mineral property with borrowed funds and then paying off the loan with before-tax dollars, instead of after-tax dollars, which the purchasers of other types of real estate must do.[20] *See* H.R.Rep. No. 91–413 (part 1), 91st Cong., 1st Sess. 138–41, U.S.Code Cong. & Admin.News, 1969, p. 1645 (1969). Under

---

**18.** *But see Standard Oil Co. (Indiana) v. Commissioner of Internal Revenue,* 465 F.2d 246 (7th Cir. 1972).

**19.** The provisions of § 636 aside, it is well settled that not all mortgage loans are accruable liabilities under the "all-events" test. *See Guardian Investment Corp. v. Phinney,* 253 F.2d 326, 331 (5th Cir. 1958).

**20.** The problem which the Tax Reform Act of 1969 specifically addressed was the so-called ABC transaction. The House Committee Report on the bill that later became § 636 described the problem as follows:

"Assume that A sells an operating business to B—the business may be an oil well, or it may be an apartment building. However, assume that A retains the right to a production payment—a payment equivalent to the current price of a specified number of barrels of oil—or in the case of the apartment building, a mortgage, which is not much different from the production payment. Then suppose that A sells the production payment or mortgage to C.

From A's standpoint, the two transactions are treated the same—they both result in a capital gain—or loss—to A depending upon his cost to other basis whether it is the apartment building or oil well which is being sold. However, the similarity between the oil well and the apartment building ends here. In the case of the apartment building, all of the rental income after ordinary expenses and depreciation is taxable income to B and he must pay off the mortgage out of 'after tax' dollars.

In the case of the oil well, however, B is not considered as receiving the production payment at all—which, in the typical case, may well amount to as much as 90 percent of the income from the well. Thus, in this case B is, in effect paying the production payment out of 'before tax dollars.' This privilege of paying off capital interests out of tax-free dollars is not a privilege accorded ordinary taxpayers."

H.R. No. 91–413 (part 1), 91st Cong., 1st Sess. 140 (1969).

**1052**

the Tax Court's reasoning, a highly speculative nonrecourse loan, on which liability is contingent upon mineral production, is converted into a production payment by § 636 so that it can receive treatment as the loan it originally purported to be. In the process, the loan gains the status of being a noncontingent liability, which the Tax Court concedes it would not otherwise have enjoyed. 73 T.C. at 559. We do not interpret § 636 to produce such an absurd result. *See United States v. American Trucking Assn's, Inc.,* 310 U.S. 534, 542–43, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940).

Based on the foregoing, we hold that the nonrecourse obligation of McNeil/Midwest to Galaxy was not a true liability for tax purposes and that it did not constitute a production payment within the meaning of § 636, under which it would have been treated as a true mortgage loan. The judgment of the district court is, therefore, AFFIRMED.